All right, Mr. Durkin, go ahead. Good morning, Your Honor, and may it please the Court. I'm actually John Klein. With the Court's permission, and different than what's on the form in front of you, I'd like to take 15 minutes and then leave 5 minutes for Mr. Durkin for rebuttal. It's up to you and Mr. Durkin. Thank you very much. You mean Mr. Durkin is not going to grace us with his eloquence? For 5 minutes, Your Honor. It's hard to believe I can keep my mouth shut. At least you brought me back to my youth. You'll have the pleasure of ending with Mr. Durkin. This is a case involving two counts of extortion, and the argument on appeal, in a nutshell, is that four evidentiary rulings in combination produced an unfair trial, a skewed factual record, a distorted picture of what happened, and an unfair trial. Rather than try to talk about all of those issues in my time, I want to focus on a couple of them, and of course I'll be happy to answer the Court's questions about the others. The first issue that I'd like to talk about is the question of immunity for G.G. Rovito. The what? The question of immunity for G.G. Rovito. You asked for it and you didn't get it. That's correct. Why should the government be forced to grab immunity? We've got about 55 cases that say they don't have to do it. You do indeed. You have a lot of cases that say that. And it will be the very unusual case where it has to be done. This is that case, and that's why I wanted to address the argument orally. Mr. Klein, forgive me, but while you're addressing it, if you could also address, since G.G. denied any involvement in the plot at all, how G.G.'s testimony could have possibly helped Mr. Davis. Yes, Your Honor. And then, you know, in doing that, if you could let us know the best evidence that G.G. could have given to aid Davis, I think that will help us. Absolutely, Your Honor. Before you get started, I also just want to signal, I am particularly interested in the gap between the Santiago proffer and the evidence the government actually admitted at trial. So I don't know who's going to cover that, but I will want to hear something about that. Very well, Your Honor. I'll turn to that next. Judge Robner, in response to your question, Judge Bower, in response to your question. I was first. You were first, but I'm answering both of you, really. You are always first in my heart. Bless you. I feel embarrassed to be here. This was a case where the extortion supposedly originated with Mr. Davis, the appellate here, went to G.G. Rovito, then went to John Rovito, then went to Carparelli and Brown, who were the heavies in this thing. The government didn't call G.G. It immunized John. John gave somewhat confusing and perplexing testimony, but essential to the government's theory in this case was that G.G. Rovito did two things. Passed money from Mr. Davis to his brother John and on down the line, number one. And number two, passed Mr. Davis' request that R.J. Serpico be beaten from Mr. Davis to John Rovito and on down the line. And supposedly communications flowed the other way as well. So G.G. Rovito was a critical link in this chain. John Rovito never talked to Mr. Davis. Carparelli never talked to Mr. Davis. Brown never talked to Mr. Davis. The only link between Mr. Davis and this plot to beat R.J. Serpico was G.G. Rovito, and that's why he was such a critical witness. Now, in his FBI 302, which is attached to Document 107 in the record, there are actually two 302s that are both attached to Document 107, G.G. Rovito denied talking to John Rovito about beating R.J. Serpico, and he denied passing any money from Mr. Davis to John Rovito. And what's critical about that is that that's the only way the money was alleged to have passed. It's the only way the information, the instruction, the order to beat R.J. Serpico was alleged to have passed. And there was some significant corroboration for what G.G. Rovito said. When the FBI first confronted him, according to his 302, he said, if my fingerprints are on that money, the FBI told him there's some unidentified fingerprints on the money, and G.G. Rovito said they're on the envelope that the money came in. And G.G. said, if my fingerprints are on that money, you can lock me up and take my restaurant. I mean, he was adamant that he had nothing to do with this. And that was the critical testimony for Mr. Davis. Without that testimony, he had no witness available to rebut this chain theory that the government had. And so that's, Judge Rovner, that's why the evidence was so critical. And, Judge Bauer, the reason this is the one case where you should give some teeth to this due process notion that there can be. Separation of powers prevents me from directing the executive to grant something he doesn't have to grant. True. But there is a due process notion that if the government abuses its immunity authority and distorts the fact-finding process in doing so, that could be a due process violation. So it's not a question of telling the government you must grant immunity. It's a question of saying there is a due process violation. An interesting concept. And a case that we allude to in our brief that actually implements this notion is it's not a case from this circuit. It's a case from my home circuit, the Ninth Circuit. It's a case called U.S. v. Straub. It's 538F3-1147. Again, it's cited in the brief but not emphasized as I wish it had been. I wrote the brief so I can criticize my own work. And what Straub says is if you've got a case where the government immunizes a witness and refuses to immunize the witness who has directly contradictory testimony, that is the due process violation. And that's what happened here. John Ravito testified to one thing, which generally supported the government's theory. G.G. Ravito had directly contradictory testimony. I didn't pass the money. I didn't talk to John Ravito about beating R.J. Serpico. And the government wouldn't immunize him. And so the jury never heard from him. So that's why I think this is the case that ought to break through the 55 cases that Your Honor referred to. Your Honor, let me turn briefly to the co-conspirator testimony. There has to be a big part of the government's case, I would say even the heart of the government's case, was these so-called co-conspirator calls involving Carparelli, Brown, and John Ravito. Typically it would be two of them on each call, but there was a series of them. And, of course, to get that evidence in, the government had to show that there was a conspiracy, that the calls were in furtherance of the conspiracy, and neither of those things was particularly disputed. But they also had to show that Mr. Davis was part of that conspiracy. He was what? Was part of the conspiracy. Oh. They couldn't. So if the calls are going to come in against him, it doesn't. Clearly there was a conspiracy. Clearly there was a conspiracy. And some of those calls were in furtherance of it. No dispute about that. Can you link to Davis? And what I'm concerned about, as I say, is what the government said in the Santiago proffer versus what Ravito said on the witness stand. Well, and what the government says in the Santiago proffer is enough to get it past the initial hurdle of putting the evidence in. But ultimately what counts is what the evidence is at trial, not what the government has in the Santiago proffer. And what the government's had at trial was thin to the point of nonexistent. It did not establish by a preponderance of the evidence that Mr. Davis was part of this conspiracy. And I'd be happy to tick through the items of evidence that the government relies on, but we do that in the reply brief point by point. The cell site evidence. So in other words, just let me get this straight. On pages 19 to 20 of the response brief where the government sets forth evidence outside the recordings showing that the conspiracy existed and that Davis was part of it, my understanding of your argument was that some of that evidence is ambiguous and can be read in a different way. But what I've been trying to figure out is where is the abuse of discretion in finding this evidence sufficient to allow the admission of the co-conspirator statements? And, you know, where specifically was the district court's error? Well, the evidence, Your Honor, I think has to be looked at. We can look at it item by item and then we can look at it collectively. But ultimately it has to add up by a preponderance of the evidence to a showing that Mr. Davis was involved in this conspiracy. And at pages 6 and following of the reply brief, we go through the government's purported independent evidence point by point and show not just that it was ambiguous but that it really had no probative force at all. Let me take the cell site evidence as an example. The government touted this highly. They put on an expert at trial. This was a big part of their showing involving Mr. Davis. And the point was to show that on a particular night, I believe in July of 2011 or 12, that Mr. Davis was at G.G. Rovito's restaurant on the night that money was passed to G.G. Rovito. Well, what the cell site evidence showed is that Mr. Davis's cell phone used cell site towers that were six or seven towers away from the restaurant. And the expert also testified on cross that 90% of the time a cell phone will use the closest tower available. So what does that evidence add up to? It doesn't add up to a showing that Mr. Davis was at G.G. Rovito's restaurant. Quite the opposite. It's almost an alibi defense. It shows that he was at most several miles away, six or seven cell site towers away, that's several miles, on the night in question. So that has absolutely no probative force. And, in fact, if anything, it tends to exculpate Mr. Davis. There was a showing that he'd had a number of phone calls with G.G. Rovito. There was nothing, of course, no evidence at all about the content of those phone calls. And there was no dispute, Mr. Davis told the FBI when they interviewed him. G.G. Rovito was a friend of his. But to suggest just by the fact of phone calls that that somehow shows that Mr. Davis was involved in a conspiracy with G.G. Rovito to have somebody's legs broken doesn't make any sense at all. There's no probative force there at all. Quite simply, the evidence at trial, particularly the independent evidence, and there has to be some, didn't connect Mr. Davis to this conspiracy. So in that sense, Judge Hamilton, it was quite different than what was represented in the Santiago problem. We don't impute any facts. Sometimes government witnesses go south. We've all seen that. Okay? Sure. But when I look at what was promised in the Santiago problem. And the government witnesses may well have gone south, but ultimately it's what the witnesses say on the witness stand that counts when the judge has to make the final determination whether there's sufficient evidence to tie Mr. Davis to the conspiracy, and there was not. Mr. Kline, at what point did the district judge really come to grips in the trial with those gaps between the Santiago proffer and the actual testimony offered? Well, there were a series of objections. There was the pretrial motion that produced the Santiago proffer, but then repeatedly as the tapes began to come in, the defense renewed this motion, and the judge each time overruled, essentially found sufficient evidence to support the. Did he take up the issue again after Revito's testimony where we get the biggest discrepancies? I don't believe so. I believe that the tapes came in. Were you trial counsel? I beg your pardon? Were you trial counsel? I was not. Mr. Durkin was trial counsel. The evidence came in during Revito's testimony, and I think throughout Revito's testimony there were a series of objections. That's putting it mildly. There were a series of objections? Yes. Yes, yes. Well, one of the mystifying things that the government says is that it's a plain error issue, and obviously it was objected to up one side and down the other. But there's no question that the district judge had squarely presented to him repeatedly what the issue was and what the concerns were and, in our view, abused his discretion. Judge Rovner, Judge Hamilton, if you have another question on that issue, I'm happy to try to answer it, and then I'll briefly touch on one other issue. Did any witness actually ID Mr. Davis as the Mickey they had met? Did Revito do that in court? No, and, Your Honor, I'm glad you mentioned that. One of the bizarre things, and I wasn't the trial counsel, so there may be some back story here that I'm not aware of. We'll ask Mr. Durkin. But, you know, Revito, John Revito, one of the things he said was that on one occasion at Gigi Revito's restaurant he saw Mickey, Mickey, whoever Mickey was. John Revito is sitting in court. He's a witness for the government. Mickey Davis, the defendant here, was sitting in court. Mickey Davis, although I confess I have not met the gentleman, is a distinctive man. John Revito describes what the Mickey he saw looked like, but is never asked to identify him. He's never asked to identify Mickey Davis sitting in court as the Mickey he saw. It's a bizarre gap in the evidence, and I would suggest a telling gap in the evidence. My light is on. I want to make sure Mr. Durkin has time to be eloquent. If there's anything else that I can answer, I'm happy to. I do have a question, please. In the questioning of John Revito about his prior statements to the FBI, the government cited cases in support of the idea that they're entitled to assume that a witness will testify truthfully. What in the record put the government on notice that John would testify inconsistently about these particular issues or facts? Your Honor, there were pleadings filed to that effect, but where it really came to a head was at page 1508 of the trial transcript. And what happened is John Revito's lawyer was in the courtroom, apparently. Mr. Durkin made some statements about what Revito would and wouldn't say. The trial judge asked the lawyers to all get together and talk about it, which they apparently did. Then Mr. Durkin comes back to the podium at page 1508 of the trial transcript and says, if called as a witness, the lawyer for John Revito would say that there are he disputes a number of things in the 302. The example, the only example, is that he was dealing drugs. That's where the record culminated on that issue, page 1508 of the trial transcript. Thank you. Thank you, Mr. Kline. Mr. Durkin? He's going to do the rebuttal. Rebuttal only. Rebuttal only. All right. Ms. Kastner? May it please the court, Andriana Kastanek on behalf of the United States. The district court did not err in permitting the government to introduce co-conspirator statements pursuant to Rule 801 D2E. The only question, as your honors know, is one of identity. The defendant acknowledges that there was a conspiracy between the Revito brothers, Paul Carparelli, and a man named Mickey. He acknowledges that his nickname is Mickey. He acknowledges that the conversations that were admitted were in furtherance of that conspiracy. And so the only question is whether there was substantial evidence in the trial transcript that the defendant is that Mickey. And although they pick out individual pieces of evidence to criticize in their brief and in their reply brief, the question is whether the course of conduct and that evidence taken together is sufficient to prove by a preponderance of the evidence that the defendant participated in a conspiracy. And it is. There is a... Is Davis correct that the government never asked any of its witnesses whether Davis was the Mickey behind the plan to break R.J.'s legs? Why did the government not ask that of any of its witnesses? I mean, it seems instead, it seems instead that the government used hearsay to allow the jury to make the connection. The government did ask the victim, R.J. Serpico, to identify Mr. Davis in the courtroom, and he did so. He testified about a long course of events in their business relationship. Sure, they had a long dealing, the investment, the loan, the defaults on the loans, and so on. Correct. The government did not ask John Revito to identify Davis in court. Why not? I do not know. The record does not reflect why the government made that decision. I can't speak to that. That's a rather startling omission here. Again, I can't speak to that. The record does not reflect the decision-making process. Clearly, given the prosecutor's injection of Davis' name as he's paraphrasing the questioning for purposes of questioning Revito. And just to clarify, that did occur once. As the district court found, it was a slip of the tongue as he was asking a witness a question. The district court found that in Grant's case. It was a slip of the tongue in a very delicate operation with the critical witness in the trial. I can recognize that, Your Honor. But the fact of the matter remains that the nature of the evidence, the course of dealings between the defendant and R.J. Serpico, coupled with the recordings in question, make very clear that the defendant is the Mickey in question. He had already personally threatened R.J. Serpico on a number of occasions, including once personally in his office. Was there more than the one? There was the one interaction in his office in January of 2013. In addition, after R.J. Serpico. Just to understand, is the defense correct that after that, you know, how's your family conversation, Mr. Davis invested additional money with the car dealership with the Serpicos? I believe that he may have invested additional money after January 2013. I'm not positive. He did take a number of actions to reform and try to financially turn around that dealership, in addition to taking more than $70,000 out of the dealership in an effort to get his loan repaid. That's what creditors do, right? Sure. And when R.J. Serpico ultimately decided to quit and move to a different dealership, the defendant, without permission, without consultation, stole vehicles from his lot, moved them to a separate lot owed by Peter DeFranzio. Stolen or just self-owned? He moved them without talking to anybody about it. So he removed two cars in addition to taking a collector's car from R.J. Serpico, and when he was confronted about these issues over the phone, the defendant claimed, I'm trying to get my effing money's worth or something along those lines. So there are a number of conversations, not limited to the January 2000 conversation in R.J. Serpico's office, that indicate that the defendant was very angry. He was willing to go to extraordinary means to collect his money, and those means were outside of the normal context of business. Angry creditors to breaking legs is a big step. Correct. And the question is, what have you got that makes that link to Mr. Davis that was admitted to trial properly? Okay, so a few things. The first is historical cell site information. While not dispositive because, of course, it only picks up the phone's location when calls are being made, but it shows that on the night in question where the down payment was made at G.G. Ravito's restaurant, $5,000 of a down payment, that the defendant was near that restaurant. So he was not at the restaurant at the exact time that the down payment was delivered because his phone didn't have data at that moment. But shortly after the down payment was alleged to have been delivered, he was about six cell towers away, so within a close radius of that restaurant. What does that mean, six cell towers away? How many miles? I don't know how many miles that is. Isn't that kind of important? I believe that the record does reflect how many miles. I just don't know off the top of my head. It was within a close radius. And the reason that the six cell towers came out is that the government's expert at trial testified he was close to that restaurant. It was consistent with the government's theory. The defense cross-examined him about it not being the closest tower, and the expert testified, yes, it appeared that he was moving away from the restaurant at the time. In addition, the conversation on the recordings indicate that the defense, I'm sorry, that the Mickey in question had close ties to the DeFranzios. That's the co-conspirator hearsay you're trying to get in, right, that we're trying to justify here? Well, the recordings themselves under this court's case law can be used to show the conspiracy. They can be, but you need more. Correct. And the course of conduct between these individuals, between the victim and the defendant, the cell phone records, the historical cell site, the discussion of who Mickey was on those calls, all of that coupled together, they can't be considered in isolation. And when they're taken together, that shows, by a preponderance of evidence, and just to be clear, the standard is less than reasonable doubt, and that although the defendant was not charged with conspiracy, so the jury did not have to make a finding on this, the jury did make a finding. It returned a verdict on the identity question. They found that the defendant indeed engaged in extortion of R.J. Serpico. Can we talk, counsel, about your Santiago proffer, in particular what was promised that John Revito would say? Yes, Your Honor. And if I'm reading this correctly, individual D is John Revito, right? Correct. Individual A is Mr. Serpico. Correct. Individual C is G.G. Serpico, or G.G. Revito. Correct. And I'm going to substitute names for those. But the promise is that Revito is going to testify at trial. He provided the following information about the conspiracy to beat Serpico. Davis approached G.G. Revito seeking to hire someone to beat Serpico. That's the promise. Never delivered, right? The recordings themselves talk about no, that's not right, Your Honor. This is in the description of what Revito is going to testify. And he doesn't come close to that, does he? He testifies that he understands a client approached his brother, G.G. Revito, and arranged to have this beating done. He acknowledged that in his testimony. Okay. That doesn't identify Davis as the client. Correct. So the gap, and I can short circuit this by acknowledging that the government anticipated at the time that it submitted its Santiago proffer that John Revito would, in fact, identify Davis as the Mickey in question. That he would say that on the night that that down payment was made, he saw the person he knew as Mickey. And he was close enough to overhear, and he was told that this was about a relationship to a car dealership, and none of that happened at trial. The witness did walk back on those admissions, those statements he had previously made. Well, he did not repeat them as sworn testimony before the jury. Correct, Your Honor. And that's, I've never seen such a big, they're rare, but I've never seen such a big gap between a Santiago proffer and testimony at trial. I can't speak to that, Your Honor, but what I can say is that the purpose of a Santiago proffer is to provisionally admit evidence. It's meant to be assessed at the end of the trial on the basis of an entire trial record, and to have, in this case, the recorded conversations stricken if the trial testimony as a whole did not support the admission of those statements under 801D2E. The problem, though, is that Santiago proffers kind of gain a kind of momentum, and judges expect that the government will deliver what's promised in the Santiago proffer. In this case, however, the defense even acknowledged, they argued, if the government does not call individual D, John Revito, then it cannot introduce any of these statements. And the district court specifically addressed that in its Santiago proffer. It said, no, I don't agree with that. I think that the evidence outside of this testimony of individual B would be sufficient. There's a specific line in the order about this. It found that the evidence as a whole, even absent individual D, would be sufficient to satisfy the government's burden by a preponderance of evidence. You know, a very close issue for me is the government's use of John Revito to impeach him. Why did the government want to impeach him? He had testified in a manner that was largely favorable to the government's case. So I'm hard pressed to see the purpose of asking him about his prior statements to the FBI, other than getting them before the jury. How did it help the government's case to call his credibility into question at that point? And if it was error to allow this, how was it harmless? The government put some very key connections before the jury with this questioning, tying the loan to the car dealership, placing Davis at the scene of the first payment, for example. Your Honor, John Revito's testimony in this case was very mixed. There were critical admissions that the government anticipated to get from him, including his participation in this conspiracy, which it did. I urge Your Honor to read the trial transcript of his testimony, because it makes very clear that in addition to giving those admissions, he was a very hostile witness. So here's a great example. I understand all of that and have taken a look. Yes, Your Honor, and it's important because it puts the use of the prior inconsistent statements in great context. So, for example, starting at page 1454 of the trial transcript, the government asked John Revito about a particular statement in a recording, I'm sorry, 1456, asked him about a particular statement in a recording where he says, hopefully they will be playing baseball again soon. And the government asked the witness, well, what does that mean? What did you mean by this? And what follows is a number of pages of back-and-forth questioning where John Revito claims that he was talking about the Cubs. He was talking about actual baseball. And so the government asked him, is that serious? Are you actually talking about the Cubs? He claims that he was. The government asks him, well, aren't you talking about a serious beating here, using a baseball bat to break someone's legs? And he walks back on that admission. He says, I don't recall, I don't know. There's a number of statements back-and-forth about that. The government then uses the prior inconsistent statement, which is a statement that he had made to the FBI about the use of the term lowers to mean breaking somebody's legs with a baseball bat. So it's important to put this into context that John Revito is not just giving admissions that are favorable to the government's case. He was a hostile witness. And so the government is impeaching particular parts of his testimony. It doesn't need to be impeaching him altogether as a witness. Sure. Given that importance and the delicacy of this, I found it very troubling that the district judge did not give at the defense request a limiting instruction at that time. Prior inconsistent statements are being put in front of him. The only reason they're being put in front of him and in front of the jury is because of the inconsistencies. And yet the judge is reluctant to highlight that inconsistency to tell the jury about what at least the lawyers think is a critical difference between  I can understand that concern, Your Honor. I think it's a very standard question of discretion on the district court's part. It is standard procedure to give the instruction at the end of the case. Right, when nobody knows what you're talking about. Sure. And to be clear, at that point, those inconsistent statements that impeachment had not been perfected. Instead, the government was providing the witness, as was proper to do under Rule 613, an opportunity to explain or deny those prior statements. And the district court determined, even though it was asked on a number of occasions, so it had a number of occasions to speak to this, that it was improper to basically have flashing lights. Hey, inconsistent statement. It did not want to highlight it, and it was within its discretion to make that determination. The jury was instructed at the end of the case, pursuant to Pattern Instruction 3.03, that it should consider a witness's prior inconsistent statements for the purposes of assessing a witness's believability. That was proper. It allowed the jury to put this into context when it was considering the evidence in the case. I want to address, while we're on the question of John Revito's testimony, Judge Rovner's question to Mr. Klein about what the government was on notice of in terms of the inconsistencies in his testimony. And I think we need to correct something in the record, which is that there were two occasions on which this was discussed with the district court. The first was on one morning, Mr. Salerno, who represented John Revito, came into court and said, there are a number of things that we disagree with in the FBI's reports in terms of the documentation of Mr. Revito's interview with the FBI. The district court said at that time, you know, this is not the time for us to discuss this. This is an issue of immunity right now. We'll discuss it at a later time. He came back, I think it was the following day, and both parties, government and defense counsel and John Revito's attorney, stepped into the hallway. They had a conversation about these precise inconsistencies. They came back on the record and they agreed that the only example of an inconsistency that Mr. Salerno could come up with dealt with the documentation of the prior statements about Carparelli's drug dealing, which was not an issue in the case. Mr. Revito was not asked about that drug dealing. And the district court concluded from that, this is not an issue. The government is acting in good faith and calling this witness. The last issue I'll discuss is the immunity for Gigi Revito. And as Judge Bauer notes, there's about 55 cases of this court saying that this is a discretionary issue on the part of the government. The government had a good faith basis to believe that Gigi Revito would perjure himself if he called to testify. He had made prior statements to the FBI that completely denied any involvement in the conspiracy, denied any knowledge of the defendant's plan to harm RJ Serpico. And the government has the utmost discretion, subject to due process violation, to deny immunity to a witness in any situation, including when it thinks that it's lying. This court noted recently in Chapman that it had never found a due process violation in this context, and this case certainly is not that unusual case that justifies such a finding. If there are no further questions from the panel, I would... Just one thing. Sure. What are we to make of the testimony that the message to be delivered with the expected beating was, don't mess with my sister? Yes, Your Honor. The government... That's a rough paraphrase. How it argued this at trial was that it was a coded message, that RJ Serpico would know who it was from and what it meant, that it wasn't, you know, the defendant wasn't going to say, hey, you owe me $300,000. This is Mickey Davis paying me my money. That's not how it works. And so he was trying to deliver a coded message through a number of intermediaries in order to have RJ Serpico understand in the context who was sending that message. Thank you. If there are no further questions, I'd ask that this panel affirm the defendant's conviction. Thank you. All right. Thank you, Ms. Kastanek. And we'll now hear from Mr. Durkin. Good morning, judges. Good morning. Seems like a jail call. How are you? Yeah. You're the one. The problem with this case is that every time we talk about discretion, every discretion went against us from the beginning to the end. Mr. Durkin, could you raise your voice? I don't want to miss a golden word. The problem with this case is that every time the court got to exercise its discretion, it exercised it against us. And there's a cumulative effect here. We did not get a fair trial. This case is nothing but hearsay. You asked some very well-pointed questions with respect to why doesn't John Revito identify Mickey Davis. I suspect it's because either he wouldn't or he couldn't, and it doesn't matter for our purposes with respect to reasonable doubt. The problem I had with this case as a trial lawyer is that we screamed about the Santiago proffer. We screamed about this whole lack of evidence, the circumstantiality of it from day one. And every time we turned around, the government got the better of the break. We didn't get the missing witness instruction even. You say about, well, there's a million cases for immunity. I get it. I understand that. But due process says you can't distort the truth-finding process, and that's what happened here. They put somebody on the witness stand, and I disagree with the government when they say we didn't agree that there was only one example of what was wrong that Mr. Salerno was talking about. I just used one example. We didn't get to have a hearing on this. I asked for that earlier, if my memory is correct, when Mr. Salerno showed up for the immunity hearing. The government was on clear notice that John Revito was going to flip them completely. They knew it on several major issues. And there is no doubt, if there's any fair reading of this transcript, that they were putting that impeachment evidence, in quotes, in front of this jury in order to elicit the truth of the information. And then they argued it later in rebuttal argument. And that's what happened here. It was one piece of hearsay on top of another piece of hearsay. They never addressed the issue. They get the hearsay in that somehow he showed up in a rustic or orange-colored Dodge Charger, and we put in evidence that Mickey Davis didn't own a Dodge Charger that was rustic. It was purple. And we put that evidence in. We put in evidence of the cell tower. They made a big deal out of this cell tower, and you're correct. It's seven miles is what the distance is on the cell tower. We put in an alternate explanation. We called Mickey Davis' stepfather, who testified that it was Mickey Davis' regular practice to play golf. Golf was the whole issue of, you know, smearing him with DeFranco and DeLaurentis. They were all golfing buddies, and there was plenty of evidence that they golfed at a country club north. And we put in, his father testified, that it was his routine practice when he went and played golf. And we put in evidence that he played golf that day. We had a receipt that showed he had played golf the day of the cell tower. And that travel pattern that was on the cell site was totally consistent with Mr. Davis going from the country club to his father's house back to I-55, which would explain his being near the restaurant at the particular time in question. That's really good evidence when your defense is reasonable doubt. They never once connected the Mickey to the Mickey Davis. And it's not like this came out of the blue. We said this was never going to happen, and it never did happen. Why couldn't we have at least gotten, if you don't want to change the law on government immunity, which I respectfully submit has been abused to the nth degree, and it might do the government well if you took a case like this and said, you know, that's right, we can't force you to do anything. But we can say that you then get a missing witness instruction or that simply there is going to be a case where there's a due process violation where the truth-finding process was so distorted that this is it. And I think this is a good case for that. You've talked about Santiago proffers. When I first started practicing law without admitting my upcoming 70th birthday, which I'm embarrassed to admit to. Amateur. I'm in good company here, I think, with Judge Bowers. You're 20 years behind. I'm only 20 behind. You used to get a hearing in the trial court. There used to be a call to Santiago. There was a hearing. Now this has become so perfunctory that it's laughable anymore. You almost feel bad. The trial judges start looking at you like you have horns coming out of your head when you start complaining about the Santiago proffer because it's just accepted as a matter of court. It's just such a little burden. What difference does it make? Well, it makes a huge difference in a case like this. Anything else? I'm sorry? Is there anything else you'd like to tell us? Plenty, but I see the red light. You get one last shot. No, that's all right. I feel strongly about this case. Thank you, counsel. The case is taken under advisement.